UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MARCUS T. GOVAN, SR., | |
| Petitioner, | |
| v. | CAUSE NO. 3:22-CV-291-MGG |
| WARDEN, | |
| Respondent. | |

OPINION AND ORDER

Marcus T. Govan, Sr., a prisoner without a lawyer, filed a habeas corpus petition to challenge his convictions for rape, attempted rape, domestic battery, and strangulation under Case No. 02D05-1809-F3-56. Following a jury trial, on July 15, 2019, the Allen Superior Court sentenced him to thirty years of incarceration.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence presented at trial:

> In the early morning hours of August 30, 2018, C.B. and a friend, Harold Johnson, were at a strip club to celebrate Johnson's birthday. Govan and C.B. had been in a relationship many years prior and shared an eight-year-old son. Govan met up with C.B. and Johnson at the strip club and later at another bar. Around 3 a.m., C.B. and Johnson left. C.B. dropped Johnson off at his apartment, which was a few units down from C.B.'s. C.B. then went to her own apartment.

A few minutes after C.B. returned to her apartment, Govan "aggressive[ly]" entered her unlocked apartment and began "manhandling" her, saying he wanted to have sex with her and trying to pull down her tights. C.B. told Govan no and "push[ed] his hands back." Govan grabbed C.B. by the neck, pushed her against the wall, and inserted his penis into her vagina. C.B. attempted to fight him off, and after a few minutes Govan stopped. He then pinned C.B. to the couch and attempted to put first his finger, and then his penis, in her anus. When he was unable to do so, he hit C.B. several times and left.

After Govan left, C.B. put on a robe and ran to Johnson's apartment. She told Johnson's mother, Ednia, that Govan raped her and asked her to call 911. Officers from the Fort Wayne Police Department responded and interviewed C.B., who was "crying" and "bleeding" from the mouth. C.B. reported Govan attacked and raped her and smashed her cell phone so she could not call 911. Officers went to C.B.'s apartment to collect evidence and found "blood splattered on the floor [and] the couch." Officers arrested Govan, who denied even seeing C.B. that night.

Medical personnel transported C.B. to a local hospital, where she presented with face, chest, neck, and genital pain, facial and knee abrasions, and bruises to her arms. A "medical forensic exam" of C.B. was conducted and revealed "she had several multiple small linear tears throughout her perineum." During the examination, the forensic examiner collected internal and external genital swabs, as well as swabs of C.B.'s buttocks, neck, ears, and breasts. Later DNA testing of the internal genital swab revealed a DNA profile "at least one trillion times more likely [to have] originated from [C.B.] and Marcus Govan, than if it originated from [C.B.] and some unknown, unrelated individual." Each of the other swabs showed similar results, all indicating "very strong support for the proposition that Marcus Govan is a contributor to the DNA profile" found on the swabs.

The State charged Govan with two counts of Level 3 felony rape—one for forcibly having "sexual intercourse" with C.B. and the other for forcibly performing "other sexual conduct" with C.B.—Level 6 felony domestic battery, Level 6 felony strangulation, and Class A misdemeanor interference with the reporting of a crime.

A jury trial was held in June 2019.

* * *

> The jury found Govan guilty of Level 3 felony rape, Level 3 felony attempted rape, Level 6 felony domestic battery, and Level 6 felony strangulation. The jury found Govan not guilty of Class A misdemeanor interference with the reporting of a crime. The trial court sentenced Govan to fifteen years each for the Level 3 felonies, to be served consecutively, and two years for the Level 6 felonies, to be served concurrent with the other sentences, for an aggregate sentence of thirty years.

ECF 10-11 at 2-6; *Govan v. State*, 182 N.E.3d 893 (Ind. App. 2022).

In the petition, Govan argues that trial counsel was ineffective for failing to lay a foundation to impeach the victim with prior inconsistent statements and for maintaining a defense strategy of consent rather a defense strategy consistent with his statements to the police that he did not interact with the victim that night. He also argues that appellate counsel was ineffective for failing to raise significant issues on appeal, that the trial record lacked sufficient evidence to support a conviction, and that the prosecution failed to disclose the forensic report, which was material exculpatory evidence.

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does,

however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

On direct appeal, Govan presented a sufficiency of the evidence argument to the Indiana Court of Appeals and the Indiana Supreme Court. ECF 10-3; ECF 10-6. On post-conviction review, Govan presented to the Indiana Supreme Court only the claim that trial counsel was ineffective for failing to lay a foundation to impeach the victim with prior inconsistent statements. ECF 10-12. Consequently, Govan fairly presented only these claims to the state courts, and the remaining claims are procedurally defaulted.

In the traverse, Govan refers to newly discovered evidence, which the court construes as an assertion of actual innocence as a basis to excuse procedural bar. ECF 21 at 7. A habeas petitioner can overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new

evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006). In this context, the court may consider evidence only if it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015).

As new evidence, Govan offers the forensic report prepared by Robert Dilley pertaining to his findings that the DNA samples obtained from the victim at the sexual assault examination matched the sample obtained from Govan at his police interview. He maintains that that this forensic report would have demonstrated that the DNA samples obtained from the victim did not match any data from the CODIS system. According to Govan, the lack of a match from the CODIS system suggests his innocence because he had prior convictions and his DNA from the CODIS system would have been a match if he had assaulted the victim as charged.

As discussed in greater detail below, the victim underwent a sexual assault examination on the night of the incident, and Nurse Cook collected DNA samples from her genitals, buttocks, neck, ears, and breasts. ECF 11-5 at 194-96. DNA testing of the internal genital swab revealed a DNA profile "at least one trillion times more likely if it originated from [the victim] and [Govan] than if it originated from [the victim] and some unknown, unrelated individual. ECF 11-6 at 44-45. The results were substantially similar for the other DNA samples and provided "very strong support for the proposition that Marcus Govan [was] a contributor to the DNA profile." *Id.* at 45-48.

At trial, Robert Dilley explained the CODIS system as follows:

5

> **Dilley:** It's a DNA database that contains a number of people that have already been arrested or committed a crime or been convicted of a crime, so their DNA profiles are already [inaudible.] However, there's also case profiles being searched in that database, and when I submit a DNA profile from a case, it could hit to a person, it could hit to another case. So it's probative and relevant then that information would get passed along to the agency of interest. So if we have a case-to-case match, it would go to both agencies. However, if we have a case to a person of interest, then they may not need a report to indicate that.

*Id.* at 56.

> On this topic, trial counsel adduced the following testimony from Dilley.
>
> **Trial Counsel:** I saw and read your report and everything about it, but I have a couple quick questions I think. With regards to page 3 of 8, the Item Number 001D, do you see where that's at?
>
> **Dilley:** Yes.
>
> **Trial Counsel:** Okay. The last paragraph in it says portions of DNA profile developed and the combined external genital swabs was entered into the combined DNA index system CODIS and will be searched on a routine basis. Was this sample that you received from the kit entered into the CODIS system?
>
> **Dilley:** Yes, it was.
>
> **Trial Counsel:** Okay. And as a result in the event the database match information regarding the matches will be provided separately. What was the outcome of that?
>
> **Dilley:** Actually, the CODIS hits if there is a match in the database. It's provided by another unit inside the [inaudible] section. However, to my knowledge, there was no match at this point.
>
> \* \* \*
>
> **Trial Counsel:** Just so I understood your last answer. You provided the portion of the DNA profile developed to someone in ISP who does the CODIS, right?
>
> **Dilley:** Yes.

> **Trial Counsel:** Okay. Not your responsibilities, not your duties. I'm not trying to pick on you. I'm just asking.
>
> **Dilley:** No, it's fair, that somebody else has that responsibility where they enter those profiles into CODIS.
>
> **Trial Counsel:** Okay. And as a result you had never seen or obtained any information that in the event there was a database match, that would be provided separately, is that correct?
>
> **Dilley:** Correct. Yes.
>
> **Trial Counsel:** Okay. Thank you.
>
> **Dilley:** As far as I'm aware, there has not been a notification made to the agency that a match has occurred.

*Id.* at 52-54. Trial counsel also referenced this line of questioning at closing, stating, "We spent a great deal of time on cross examination regarding CODIS, and how it functions and what it works, even though it's not his department, it's still under the Indiana State Police, but did you see any evidence that says CODIS confirmed that it was Mr. Govan's DNA?" *Id.* at 106.

To Govan's point, the forensic report was not admitted into evidence at trial and may technically qualify as "new evidence." However, according to Govan, the forensic report is exculpatory specifically because it would have shown that the DNA samples obtained from the victim did not match any data from the CODIS system. At trial, trial counsel read this portion of the forensic report into the record, and Dilley, who prepared the report, confirmed its accuracy. Consequently, the purportedly exculpatory portion of the forensic report would have amounted to cumulative evidence that would have added no significant advantage with respect to credibility or persuasive force.

7

Trial counsel placed further emphasis on the match with the CODIS system by raising it again during closing argument. As a result, the court cannot find that it is more likely than not that no reasonable juror would have found Govan guilty beyond a reasonable doubt in light of this newly discovery evidence. Therefore, the assertion of actual innocence does not excuse the procedurally defaulted claims.

## STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

## DISCUSSION

### Sufficiency of the Evidence

Govan argues that he is entitled to habeas relief because the trial record lacked sufficient evidence to support his convictions. For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

At trial, Govan faced the following charges: (1) rape based on allegations that he forcibly engaged in sexual intercourse with the victim; (2) rape based on allegations that he forcibly placed his finger and attempted to place his penis in the victim's anus; (3) domestic battery based on allegations that he physically struck the victim; and (4)

strangulation based on allegations that he grabbed the victim's neck and impeded her ability to breathe.[1] ECF 11-5 at 19-20. At trial, the victim testified that she had an eight-year old son with Govan but had ended her relationship with Govan more than five year earlier. *Id.* at 43-66. At midnight on August 30, 2018, she took Harold Johnson, her godson, to a strip club to celebrate his twenty-first birthday. *Id.* She agreed by telephone that Govan would join them at the strip club and paid his entry fee. *Id.* After ninety minutes, she and Harold Johnson went to a local bar, where Govan joined them again. *Id.* The victim had one alcoholic drink at the strip club but drank only water at the bar. *Id.* Thirty minutes later, she took Harold Johnson home, and Endia Johnson, her neighbor and Harold Johnson's mother, assisted with carrying Harold Johnson, who was quite drunk, into the apartment. *Id.*

Afterwards, the victim returned to her apartment and heard a knock on her door ten minutes later. *Id.* She anticipated that Endia Johnson had arrived to discuss her son's birthday, but instead Govan came into her apartment and told her that he wanted to have sex. *Id.* He pulled her clothes off, including her tights, despite her physical and verbal efforts to stop him, and placed his penis into her vagina. *Id.* As she tried to escape, Govan pinned her to the couch from behind, spit on his hands, and pressed his finger and his penis into her anus but did not achieve full penetration. *Id.* When she told him to stop, he hit her. *Id.* At some point, Govan kissed her neck and breasts. *Id.* He also

---

[1] At trial, Govan also faced a charge of interference with reporting a crime based on allegations that he destroyed the victim's cellphone with the intent of preventing her from calling 911. ECF 11-5 at 20. However, the jury acquitted him of this charge, so it is not relevant for purposes of analyzing the sufficiency of evidence claim. ECF 11-6 at 116.

10

grabbed her neck and made it so that she could barely breathe. *Id.* When Goven stopped assaulting the victim, she told him that she intended to call the police. *Id.* He grabbed her cellphone, went outside, threw it down on the concrete, and left. *Id.*

Following Govan's departure, the victim went to the Johnson residence and told Endia Johnson to call the police because Govan had raped her. *Id.* She was transported by ambulance to the hospital and later went to the Sexual Assault Treatment Center, where a nurse examined her. *Id.* Her injuries included a bruised arm and neck and a bloody nose. *Id.* On cross-examination, the victim testified that Endia Johnson have visited her apartment briefly before Govan arrived. *Id.* at 73.

Endia Johnson's testimony was largely consistent with the victim's narrative, except that she denied visiting the victim's apartment before Govan arrived. *Id.* at 92-106. Harold Johnson testified that he saw Govan at the strip club and at the local bar. *Id.* at 107-13. He testified that the victim had drank some Hennessy prior to the strip club and drank more than one alcoholic drink at the strip club. *ID.*

Austin Jett testified that he served as the emergency medical technician who transported the victim to the hospital. *Id.* at 115-20. She reported that she had been punched and raped, that Govan had placed his penis in her vagina and his fingers inside her anus, and that she felt pain, including genital pain. *Id.* Jett did not observe the scent of alcohol or any other signs of intoxication. *Id.* She appeared upset and had blood from the inside of her upper lip. *Id.* Dr. Tyler Johnson testified that he served as the emergency physician. *Id.* at 124-31. The victim appeared very distressed and that she had extreme pain on the left side of her face as well as pain on the left side of her neck,

11

her right arm, her right leg, vaginal region, and anal region. *Id.* He observed contusions to her face and referred her to the sexual assault resource team. *Id.*

Leslie Cook testified that she served as a nurse at the sexual assault treatment center and has conducted about 1,100 sexual assault examinations. *Id.* at 161-204. She explained that few of her patients have physical injuries. *Id.* Genital injuries are not common because the genital area has robust blood flow, which facilitates faster healing, and elasticity, which reduces the risk of injury. *Id.* She estimated that only thirty percent of her patients presented with genital injuries. *Id.* The victim's injuries included two forehead contusions, a cut on the inside of the upper lip, a bruise on her inner right arm, and multiple small tears on her perineum. *Id.* The victim also reported tenderness near the top of her anus. *Id.* Nurse Cook collected DNA samples from the victim. *Id.* A follow-up examination six days later revealed latent bruising on the left arm. *Id.*

Police officers testified that they served as first responders and took photographs of the victim's residence, which had blood spatter on the floor and a couch cushion and appeared to be in disarray, and collected the broken cellphone and a bloody pillow. *Id.* at 131-55. They also went to Govan's residence for the purpose of interviewing him. *Id.* Detective Roddy interviewed Govan, who denied any involvement with the victim during the prior night and represented that he had spent the night with his cousin, Raymond Britt, at his cousin's girlfriend's house. ECF 11-6 at 4-21. Detective Roddy could not locate the cousin or the girlfriend because Govan did not provide enough information for him to do so. *Id.* Govan also provided a DNA sample. *Id.*

Robert Dilley testified that he performed tests on the DNA samples collected from the victim's genitals, buttocks, neck, ears, and breasts and compared them to the DNA sample collected from Govan by Detective Roddy. *Id.* at 29-59. DNA testing of the internal genital swab revealed a DNA profile "at least one trillion times more likely if it originated from [the victim] and [Govan] than if it originated from [the victim] and some unknown, unrelated individual." *Id.* The results were substantially similar for the other DNA samples. *Id.* To Dilley's knowledge, the DNA profiles did not match with any data from the CODIS system, but entering data into the CODIS system was not part of his job responsibilities. *Id.*

On direct appeal, Govan's argument focused on contradictions between the victim's testimony and the testimonies of Endia Johnson and Harold Johnson on the issues of how much alcohol she drank that night and whether Endia Johnson had visited her apartment that night prior to the rape incident. ECF 10-4. The Indiana Court of Appeals rejected the argument, finding that it amounted to no more than an invitation to reweigh the credibility of the victim. ECF 10-5.

After reviewing the record, the court cannot find that the State court made an unreasonable determination on the insufficiency of the evidence claim. A rational jury could have credited the victim's testimony over the testimonies of Endia Johnson and Harold Johnson to the extent those testimonies were in conflict. Further, the precise number of drinks and whether Endia Johnson briefly visited the victim's apartment were not dispositive issues, and a rational jury could have also credited Endia Johnson

13

and Harold Johnson on these issues while also crediting the victim's broader narrative that Govan assaulted her in her apartment.

In the traverse, Govan's argument regarding insufficient evidence focuses on purported contradictions between the victim's testimony and the sexual assault examination and DNA evidence. The medical examinations revealed facial injuries, bruising to the neck and arms, tears on the perinium, and reports of pain in the vaginal and anal regions were thus consistent with the victim's testimony that Govan had assaulted her. Though Nurse Cook did not find any injuries to the vaginal or anal regions, these findings were not inconsistent with the victim's narrative given Nurse Cook's testimony that, in her substantial experience, the majority of sexual assault victims did not have such injuries.

Moreover, Govan places undue weight on lack of a match in the CODIS system mentioned in the forensic report. To start, Govan assumes that, because he had prior convictions, his DNA had necessarily already been entered into the CODIS system. *See* Ind. Code Ann. § 10-13-6-10(a) (requiring certain classes of felony convicts to provide DNA for entry into the CODIS system). However, even assuming that Govan's prior convictions required him to provide DNA for entry into the CODIS system, he does not affirmatively indicate that he provided such DNA or that such entry occurred. Further, Govan relies on Robert Dilley's statement to demonstrate the lack of a match, but Dilley's testimony indicated merely that interfacing with the CODIS system was not his responsibility and that he did not have personal knowledge of whether there was match. Most significantly, while the DNA collected from the victim may not have

14

matched with data from the CODIS system for any number of reasons, it did match with the DNA collected directly from Govan by Detective Roddy, and Govan does not contest this compelling forensic result. Therefore, the insufficiency of the evidence claim is not a basis for habeas relief.

## Ineffective Assistance of Trial Counsel

Govan argues that trial counsel was ineffective for failing to lay a foundation to impeach the victim with prior inconsistent statements. He maintains that trial counsel should have asked the victim whether she had said she wanted to "get even" with Govan and wanted to get him "out of the way" in connection with the custody battle over their son. He maintains that, if trial counsel had done so, Virgil Smith, Zelma Petrie, and Morris Govan would have been able to testify that the victim made such statements for the purpose of impeachment.

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that

15

reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

Before trial, the trial court heard the following argument with respect to motions in limine:

> **Prosecution:** And also the custody issue. This is a criminal trial. We want to make sure that the custody issue is not brought into this.
>
> **Trial Court:** [Trial counsel]?
>
> **Trial Counsel:** We have issues with that in regard because once again that flows back then the issue of the health care. She has told everyone that the reason that the custody issue has ensued was because had all these kidney problems, when actually that is not the case. The State doesn't take children away for health issues.
>
> **Prosecution:** Your Honor, any reason why if the children were taken away, which we don't believe that they were. We believe that because of her health issues she gave the children away, but, at any rate, that's not relevant to what we're here for today, which is rape, domestic battery, strangulation, and interfering with reporting of a crime. That is a side issue, and it will unduly influence the jury, confuse them, frankly.

16

> **Trial Counsel:** In response, Your Honor, it's her motive. You'll hear testimony that says she would do whatever she needed to to get that child back.
>
> **Prosecution:** I guess that's kind of a moot point because she doesn't have the child currently. That child is currently with his mom.
>
> **Trial Court:** Yeah, I don't like to dabble in family law issues in criminal court, so let's keep that our of evidence unless somewhat she opens the door for [trial counsel]. But I don't like the idea of doing family law court in criminal court.

ECF 11-5 at 12-13.

At trial, trial counsel attempted to ask Zelma Petrie, Govan's mother, about the nature of the victim's relationship with Govan in recent years, but the trial court sustained the prosecution's objection that such testimony would violate the ruling on the motion in limine. *Id.* at 231-33. Trial counsel presented Virgil Smith, the victim's cousin, as a witness in an apparent effort to introduce hearsay statements attributed to the victim on the topic of her children, but the trial court sustained the prosecution's hearsay objection. ECF 11-6 at 70-77. Trial counsel also presented Morris Govan, Govan's father, as a witness in an apparent effort to introduce the opinion that the victim fabricated the rape incident against Govan to regain custody of her son. *Id.* at 78-87. However, the trial court sustained the prosecution's objection that the opinion testimony invaded the province of the jury. *Id.*

At the post-conviction stage, Govan presented an affidavit from Zelma L. Petrie, attesting that she believed that the victim fabricated the rape accusation to regain custody of her son. ECF 12 at 2. He presented an affidavit from Virgil Smith, attesting

17

that he was aware of the custody proceeding and "became aware through [the victim]" that she wanted Govan "out of the way". *Id.* at 5. He also presented an affidavit from Morris Govan, attesting that the victim told him that she intended to "get even" with Govan for obtaining custody of her son. *Id.* at 4.

The Indiana Court of Appeals rejected the ineffective assistance of counsel claim, finding a lack of deficient performance on the basis that none of the proposed testimony would have been inadmissible under Ind. R. Evid. 613, which allows the use of prior inconsistent statements to impeach a witness. ECF 10-11 at 13-14. The appellate court observed that only Morris Govan's proposed testimony involved a statement from the victim and that Govan had not identified any portion of the victim's testimony that this proposed testimony would have impeached. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on this ineffective assistance of counsel claim. Govan asserts that trial counsel should have, in essence, invited the victim to lay the foundation for the introduction of prior inconsistent statements by asking the victim about whether she made threats against him in connection with the child custody proceedings. However, the ruling on the motion in limine foreclosed trial counsel from asking such questions as demonstrated by the trial court's motion in limine ruling before trial and the ruling on the objection to Zelma Petrie's testimony on the nature of the victim's relationship with Govan in recent years. Further, it is not clear that such questions would have produced the desired result, and it may have even prejudiced Govan. It is possible that the victim may have simply admitted to making unsavory

threatening statements about Govan when she lost custody of her son. If so, the proposed testimony would have been consistent with the victim's testimony and thus inadmissible as a prior inconsistent statement. The victim also would have likely been granted the opportunity to provide context for such testimony, potentially engendering sympathy towards herself and disdain with respect to Govan.

Additionally, even if the victim testified as Govan anticipates, the jury may not have afforded much weight to the testimony of Morris Govan, given his close familial relationship with Govan and the understandable frustration of losing custody of a child. Moreover, the impact proposed testimony is further blunted because it would have served only to impeach the victim's testimony rather than as substantive evidence. *See Martin v. State*, 736 N.E.2d 1213, 1217 (Ind. 2000) ("[W]hen a prior inconsistent statement is used to impeach a witness, it is not hearsay because the statement is not used to prove the truth of the matter asserted."). As detailed above, the evidence corroborating the victim's narrative was substantial, including Harold Johnson's testimony that Govan was with the victim on the night of the incident, photographs of her apartment in disarray, photographs and documentation of her physical injuries, testimony from several witnesses about her apparent emotional distress in the immediate aftermath, her shattered cellphone, and the presence of Govan's DNA on her genitals, buttocks, neck, ears, and breasts.

In sum, the court cannot find that trial counsel performed deficiently because he was foreclosed from asking questions about the child custody proceedings by the ruling on the motion in limine and by Ind. R. Evid. 613 and because, even if he was not, it is

unclear that such questions would have resulted in a meaningful advantage to Govan. Therefore, the claim of ineffective assistance of trial counsel is not a basis for habeas relief.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Govan to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on November 15, 2022

                                                  s/ Michael G. Gotsch, Sr.
                                                  Michael G. Gotsch, Sr.
                                                  United States Magistrate Judge